**Vaughn L. MURPHY, Plaintiff,**

v.

**UNITED PARCEL SERVICE,
INC., Defendant.**

**No. 95–4126–SAC.**

United States District Court,
D. Kansas.

Oct. 22, 1996.

Kirk W. Lowry, Palmer & Lowry, Topeka, KS, for Vaughn L. Murphy.

Leonard Singer, Allan L. Bioff, Brian J. Finucane, Sharon D. Hess, James R. Holland, II, Bioff, Singer & Finucane, Kansas City, MO, for United Parcel Service, Inc.

## MEMORANDUM AND ORDER

CROW, District Judge.

Vaughn L. Murphy brings this employment discrimination action against his former employer, United Parcel Service, Inc. (UPS), for alleged violations of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.* Specifically, Murphy claims that UPS terminated his employment due to his disability, hypertension. According to Murphy, he suffers from high blood pressure. Unmedicated, Murphy's blood pressure runs at approximately 250/160. Murphy contends that his high blood pressure limits his major life activities of walking, seeing, lifting, climbing, performing manual tasks, eating, exercising, hearing and working.

In August of 1994, Murphy was hired as a mechanic by UPS. Prior to hiring Murphy, UPS required him to pass a physical. Murphy initially "passed" the physical examination and was issued a Department of Transportation Health Card. Upon closer inspection, UPS subsequently discovered that Murphy's high blood pressure precluded him from holding a valid DOT Health Card and required Murphy to take another blood pressure test. Murphy's blood pressure was 160/102, above UPS' and the DOT's upper threshold. Based upon this determination UPS fired Murphy.

Murphy contends that this act by UPS violated the ADA. Murphy contends that he was a qualified mechanic and that UPS' act of firing him violated the ADA. Murphy contends that driving a truck was a marginal duty and that UPS failed to reasonably accommodate his disability.

UPS denies Murphy's claims. First, UPS contends that Murphy's high blood pressure does not qualify as a disability within the meaning of the ADA. Second, UPS contends that its decision to terminate Murphy was based upon his inability to lawfully perform an essential function of the job—operate a large truck. Due to Murphy's high blood pressure, he could not meet the minimally acceptable standards set by the DOT. Finally, UPS contends that it compliance with DOT regulations is a complete defense to

Murphy's ADA claim, or in the alternative, that there was no reasonable accommodation available which would have permitted Murphy to perform the essential functions of his job.

This case comes before the court upon UPS' motion for summary judgment (Dk.39). Murphy has filed a response and UPS has filed a reply. The court, having considered the briefs of the parties and the applicable law, grants UPS' motion.

### Summary Judgment Standards

A court grants a motion for summary judgment if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The substantive law governing the suit dictates which facts are material or not. *Id.* at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

The movant's burden under Rule 56 of the Federal Rules of Civil Procedure is to lay out the basis of its motion and to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). "A movant is not required to provide evidence negating an opponent's claim." *Committee for First Amendment v. Campbell*, 962 F.2d 1517, 1521 (10th Cir.1992) (citation omitted).

If the moving party meets its burden, then it becomes the nonmoving party's burden to show the existence of a genuine issue of material fact. *Bacchus Industries, Inc. v. Arvin Industries, Inc.*, 939 F.2d 887, 891 (10th Cir.1991); *see Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) ("If the moving party meets this burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case."). When the nonmoving party will have the burden of proof at trial, "Rule 56(e) ... [then] requires the nonmoving party to go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun*, 956 F.2d 949, 951 (10th Cir.1992) (citations omitted); *see Martin*, 3 F.3d at 1414 (non-moving party cannot rest on the mere allegations in the pleadings). "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 929 (7th Cir. 1995); *see Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 479 (1st Cir.1993) ("Optimistic conjecture, unbridled speculation, or hopeful surmise will not suffice."). The court views the evidence of record and draws inferences from it in the light most favorable to the nonmoving party. *Burnette v. Dow Chemical Co.*, 849 F.2d at 1273.

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir.1986), *cert. de-*

*nied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

### Uncontroverted Facts

Murphy has had high blood pressure (hypertension) since he was ten years old. The only limitation placed Murphy by a physician related to his high blood pressure is that he was instructed to not hold a job requiring repetitive lifting of 200 pounds.

For over 22 years, Murphy has performed mechanic jobs that did not require DOT certification without any limitation resulting from hypertension other than the self-imposed restriction of using a lever to lift heavy objects, not running to answer the phone, not working above his head and not performing heavy or very heavy work. Murphy contends that medicated hypertension otherwise limits his ability at times and under some circumstances to run, eat, exercise, breath, hear and see.[1] However, Murphy's own physician and UPS' medical expert each testified that Murphy's hypertension does not significantly restrict his activities and that in general he can function normally and can engage in activities that other persons normally do.

In early August 1994, Murphy applied for a position as a mechanic at UPS. Murphy knew that driving would be part of his job duties as a UPS mechanic. Murphy also knew that as a condition of his employment, he would be required to take and pass a DOT physical and obtain a DOT health card. On August 18, 1994, Murphy was hired by UPS to work as a mechanic.

The UPS job description for mechanic states that the essential functions include a commercial driver's license, meeting DOT regulations and operating a standard transmission. DOT regulations define a "commercial motor vehicle" as "... any self-propelled or towed motor vehicle used on public highways in interstate commerce to transport passengers or property when: (a) The motor vehicle has a gross weight rating of 10,001 or more pounds ..." 49 C.F.R. § 390.5. UPS considers driving commercial motor vehicles an essential function of Murphy's job as me-

chanic. As a mechanic, Murphy drove UPS vehicles with grass weight ratings of 10,001 or more pounds. Murphy and other UPS mechanics were expected and required to drive tractor trailers and package cars. A tractor trailer has a gross weight rating of 55,000 pounds, while a package car has a gross weight rating of 12,000 to 20,000 pounds.

Murphy and other UPS mechanics were expected and required to drive tractor trailers and package cars to perform "road tests" and "road calls." During a "road test," a mechanic takes the vehicle being repairing out on the road to diagnose the problem or determine if the previously diagnosed problem has been fixed. During a "road call," a mechanic has to deliver an operating vehicle to a driver whose package car has broken down, fix the broken vehicle, and drive it back to the facility. Sometimes packages on board were traveling in interstate commerce.

During the five weeks that Murphy worked for UPS, he performed road tests on UPS vehicles between 12 and 18 times. Because he worked the night shift, Murphy's driving of commercial vehicles would primarily be performing road calls on tractor trailers and road tests on package cars. All of the vehicles which Murphy worked were commercial motor vehicles. At times, Murphy was the only mechanic on duty in Topeka and was the only employee available to perform road tests or road calls. UPS expected Murphy and other mechanics to be able to drive commercial motor vehicles on every shift they worked.

DOT Regulations require that a driver of a commercial motor vehicle must be "physically qualified" and have a medical examiner's certificate. With respect to high blood pressure the regulations provide as follows:

(a) A person shall not drive a commercial motor vehicle unless he/she is physically qualified to do so and ... has on his person the original, or a photographic copy, of a medical examiner's certificate that he is physically qualified to drive a motor vehicle.

---

1. To the extent that these conditions exist and are not controlled by medication, they further demonstrate that UPS' decision to preclude Mur-

phy from operating its commercial trucks on the road was a legitimate business decision and not a pretext for discrimination.

(b) A person is physically qualified to drive a commercial motor vehicle if that person . . .

(6) Has no current clinical diagnosis of high blood pressure likely to interfere with his/her ability to operate a commercial motor vehicle safely.

49 C.F.R. § 391.41.

In September, 1988, the DOT issued the *Medical Regulatory Criteria for Evaluation [of High Blood Pressure] Under Section 391.41(b)(6),* which address the question under Section 391.41(b)(6) of whether an individual has a current clinical diagnosis of high blood pressure that is likely to interfere with a driver's ability to operate a motor vehicle and when further tests may be necessary.

The *DOT Medical Regulatory Criteria for Evaluation* provides that in order to be physically qualified to drive a commercial motor vehicle, other than a temporary three month certification for evaluation and treatment of mild hypertension (from 161/91 to 180/104), an individual must maintain blood pressure less than or equal to 160/90.

Murphy's blood pressure at all relevant times was above the 160/90 standard established in the DOT *Medical Regulatory Criteria for Evaluation.* Murphy's treating physician testified that Murphy will never be able to qualify for a job that requires a blood pressure reading of 160/90 or below. Murphy is unable to use medication to reduce his blood pressure below 160/100 without suffering severe side effects such as stuttering, loss of memory, impotence, lack of sleep and irritability. Murphy's treating physician testified that Murphy "would not be able to function" if he took medication to get his blood pressure below 160/90.

UPS requires all mechanics to take a DOT physical and secure a DOT health card prior to starting work. Other than his position at UPS, Murphy has never been required to obtain DOT certification for any other job.

On August 16, 1994, took his physical for his DOT exam. Murphy's blood pressure was 186/124. Despite his elevated blood pressure, Murphy was issued a DOT health card by the testing clinic. Based upon his high blood pressure, Murphy should have been disqualified on his initial exam and not issued a DOT health card. On September 15, 1994, while reviewing medical records, the UPS Medical Supervisor discovered that Murphy's blood pressure was above the DOT standard and that his DOT health card had been issued in error. On September 26, 1994, Murphy's blood pressure was tested again but was still above the DOT standard of 160/90.

On October 5, 1994, UPS terminated Murphy's employment. Murphy did not request any accommodations other than requesting a waiver and additional time to get his blood pressure within the DOT standards. Approximately two to three weeks after his termination by UPS, Murphy has secured another mechanic job with Car Clinic. In his position with Car Clinic, Murphy was not required to obtain DOT certification. Murphy currently remains employed at Car Clinic.

## ADA

"Enacted in 1990, the ADA is designed to level the playing field for the more than 43,000,000 Americans who have one or more physical or mental disabilities." *Schmidt v. Methodist Hosp. of Indiana, Inc.,* 89 F.3d 342, 344 (7th Cir.1996). "The ADA and its attendant regulations were enacted, in part, to address perceived inadequacies in the Rehabilitation Act of 1973, 29 U.S.C. § 794." *Hutchinson v. United Parcel Service, Inc.,* 883 F.Supp. 379, 387 (N.D.Iowa 1995). In its findings, Congress concluded that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Congress also found that "individuals with disabilities continually encounter various forms of discrimination" 42 U.S.C. § 12101(a)(5). One of the purposes of the ADA was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). *See Hutchinson,* 883 F.Supp. at 390 (thoroughly discussing the history of the ADA). Howev-

er, "[t]he ADA is not a job insurance policy, but rather a congressional scheme for correcting illegitimate inequities the disabled face." *Hedberg,* 47 F.3d at 934. "The ADA became effective on July 26, 1992, and it does not apply retroactively." *Garcia–Paz v. Swift Textiles, Inc.,* 873 F.Supp. 547, 557 (D.Kan.1995).

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "The term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

"To maintain a claim for wrongful discharge under the ADA, a plaintiff must demonstrate (1) that she is a disabled person within the meaning of the ADA; (2) that she is able to perform the essential functions of the job with or without reasonable accommodation; and (3) that the employer terminated her because of her disability." *Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170, 1173 (10th Cir.1996). *See White v. York Int'l Corp.,* 45 F.3d 357, 360–61 (10th Cir.1995) ("Accordingly, to qualify for relief under the ADA, a plaintiff must establish (1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that the employer terminated him because of his disability."); *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1123 (10th Cir.1995).

"The ADA does not define the term 'major life activities'" as used in 42 U.S.C. § 12102(2)(A). However, "[t]he ADA regulations adopt the definition of 'major life activities' found in the Rehabilitation Act regulations, 34 C.F.R. § 104." *Bolton v. Scrivner, Inc.,* 36 F.3d 939, 942 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995). "The term means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* (*quoting* 29 C.F.R. § 1630.2(i)).

> To demonstrate that an impairment "substantially limits" the major life activity of working, an individual must show "significant[ ] restriction in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Id.* 1630.2(j)(3)(i) (emphasis added). The regulations specify that "the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.*

*Bolton,* 36 F.3d at 942. *See MacDonald v. Delta Air Lines, Inc.,* 94 F.3d 1437 (10th Cir.1996).

The Tenth Circuit has endorsed a two-part analysis for determining whether a person is qualified under the ADA:

> First, we must determine whether the individual could perform the essential functions of the job, *i.e.,* functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

*Milton,* 53 F.3d at 1123 (*quoting White,* 45 F.3d at 361–62) (*quoting Chandler v. City of Dallas,* 2 F.3d 1385, 1393–94 (5th Cir.1993), *cert denied,* —— U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994)).

■ Under the ADA the term "discriminate" includes an employer's "not making reasonable accommodations to the known physical or mental limitations of an otherwise

qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). *See Lowe*, 87 F.3d at 1174. "It is plain enough what 'accommodation' means. The employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." *Vande Zande v. State of Wis. Dept. of Admin.*, 44 F.3d 538, 542 (7th Cir.1995).

The term "reasonable accommodation" may include:

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

### Burden of Proof under the ADA

■ "Plaintiff has the burden to establish that he is 'disabled' and 'qualified' to perform the essential functions of the job either with or without reasonable accommodation." *Dutton v. Johnson County Bd. of County Com'rs*, 859 F.Supp. 498, 504 (D.Kan.1994); *see Tyndall v. National Educ. Centers*, 31 F.3d 209, 213 (4th Cir.1994) ("Plaintiff bears the burden of demonstrating that she could perform the essential functions of her job with reasonable accommodation.").

Once the plaintiff produces evidence sufficient to make a facial showing that accommodation is possible, the burden of production shifts to the employer to present evidence of its inability to accommodate. (citations omitted). If the employer presents such evidence, the plaintiff may not simply rest on his pleadings. He "has the burden of coming forward with evidence concerning his individual capabilities and suggestions for possible accommodations to rebut the employer's evidence." *Prewitt v. United States Postal Serv.*, 662 F.2d 292, 308 (5th Cir. Unit A 1981); *see Mason [v. Frank]*, 32 F.3d [315] at 318 [8th Cir.1994]; *Chiari v. City of League City*, 920 F.2d 311, 318 (5th Cir.1991). As with discrimination cases generally, the plaintiff at all times bears the ultimate burden of persuading the trier of fact that he has been the victim of illegal discrimination based on his disability. *See St. Mary's Honor Ctr. v. Hicks* [509 U.S. 502, 506–12], 113 S.Ct. 2742, 2747–49 [125 L.Ed.2d 407] (1993) (citations omitted).

*White*, 45 F.3d at 361.

### Analysis

### Has Murphy demonstrated that he has disability within the meaning of the ADA?

UPS contends Murphy's medicated blood pressure is not a disability within the meaning of the ADA. Although Murphy's hypertension precludes him from certain strenuous activities, UPS argues that his condition is not of such a degree that it substantially effects one or more major life activities. UPS contends that the minor inconveniences caused by Murphy's hypertension are insufficient to establish the existence of a disability.

Murphy responds, arguing that his hypertension is clearly a disability within the meaning of the ADA. Murphy contends that his condition fits each of the factors set forth in 29 C.F.R. § 1630.2(j) for determining the existence of a disability. Based upon the nature and severity of his hypertension, the duration and expected duration of the impairment, the permanent or long term impact on a person, and the work limitations his condition causes. In some detail, Murphy describes the consequences, some of them dire such as a heart attack or a stroke, which may result from high blood pressure. Murphy also contends that his condition should be judged by its unmedicated state.

In its response, UPS argues that Murphy is trying to have it both ways. To demonstrate that he is disabled, Murphy sets forth several of the serious consequences which can result from his high blood pressure.

Then in a subsequent section of his brief, Murphy, in an effort to demonstrate that he is qualified for the position with UPS, essentially argues that his high blood pressure posed no threat or obstacle to the performance of his duties as mechanic. UPS argues that Murphy should not be permitted to withstand summary judgment based upon such inconsistent positions. UPS contends that illnesses effectively controlled by medication do not constitute a "disability" under the ADA.

### Medicated or Non–Medicated State

 Murphy's contention that his disability should be evaluated in its unmedicated state is based primarily on the EEOC's Interpretative Guidance, Section 1630.2(j),[2] which states in pertinent part:

An impairment that prevents an individual from performing a major life activity substantially limits that major life activity. For example, an individual whose legs are paralyzed is substantially limited in the major life activity of walking because he or she is unable, due to the impairment; to perform that major life activity.

Alternatively, an impairment is substantially limiting if it significantly restricts the duration, manner or condition under which an individual can perform a particular major life activity as compared to the average person in the general population's ability to perform that same major life activity. Thus, for example, an individual who, because of an impairment, can only walk for very brief periods of time would be substantially limited in the major life activity of walking. An individual who uses artificial legs would likewise be substantially limited in the major life activity of walking because the individual is unable to walk without the aid of prosthetic devices. Similarly, a diabetic who without insulin would lapse into a coma would be substantially limited because the individual cannot perform major life activities without the aid of medication.

. . . . .

The determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis, without regard to mitigating measures such as medicines, or assistive or prosthetic devices.

29 C.F.R. Pt. 1630, App. § 1630.2(j). However, in a subsequent section of those same guidelines, Section 1630.2(1), titled "Regarded as Substantially limited in a Major Life Activity," the EEOC opines:

If an individual cannot satisfy either the first part of the definition of "disability" or the second "record of" part of the definition, he or she may be able to satisfy the third part of the definition. The third part of the definition provides that an individual who is regarded by an employer or other covered entity as having an impairment that substantially limits a major life activity is an individual with a disability.

There are three different ways in which an individual may satisfy the definition of "being regarded as having a disability":

(1) The individual may have an impairment which is not substantially limiting but is perceived by the employer or other covered entity as constituting a substantially limiting impairment;

(2) The individual may have an impairment which is only substantially limiting because of the attitudes of others toward the impairment; or

(3) The individual may have no impairment at all but is regarded by the employer or other covered entity as having a substantially limiting impairment.

Senate Report at 23; House Labor Report at 53; House Judiciary Report at 29. An

---

**2.** The EEOC published as an appendix to the regulations a section-by-section "Interpretive Guidance on Title I of the Americans with Disabilities Act." 29 C.F.R. Pt. 1630, App. We have looked to this source in interpreting the ADA. *See Carparts Distrib. Ctr., Inc. v. Automotive Wholesaler's Ass'n*, 37 F.3d 12, 16 (1st Cir. 1994). Such administrative interpretations of the Act by the enforcing agency, "while not con-

trolling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986).

*Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 672 (1st Cir.1995).

individual satisfies the first part of this definition if the individual has an impairment that is not substantially limiting, but the covered entity perceives the impairment as being substantially limiting. For example, suppose an employee has controlled high blood pressure that is not substantially limiting. If an employer reassigns the individual to less strenuous work because of unsubstantiated fears that the individual will suffer a heart attack if he or she continues to perform strenuous work, the employer would be regarding the individual as disabled.

This section appears to be at odds with interpretative guidelines found in § 1630.2(j). Under § 1630.2(j) of the EEOC's interpretive guidelines, a person's unmedicated high blood pressure would constitute a disability. Yet, the interpretative guidelines in § 1630.2(1) implicitly suggest that a person who has controlled his blood pressure by medication does not have a disability; if this were not so, why would a person suffering from high blood ever have to look to the "regarded as" section of the ADA to prove the existence of a disability? The apparent tension between the two sections of the EEOC's interpretive guidelines is not easily resolved.

In any event, although some courts have expressly or implicitly apparently followed the EEOC's interpretative guideline § 1630.2(j), see, e.g., Sarsycki v. United Parcel Service, 862 F.Supp. 336, 340 (W.D.Okla. 1994) (without insulin plaintiff would be unable to perform major life activities), several courts have explicitly or implicitly rejected the EEOC's Interpretative Guidance, finding that an illness effectively controlled by medication does not constitute a disability under the ADA. See Ellison v. Software Spectrum, Inc., 85 F.3d 187, 191 n. 3 (5th Cir.1996) ("Arguably, on the other hand, had Congress intended that substantial limitation be determined without regard to mitigating measures, it would have provided for coverage under § 12102(2)(A) for impairments that have the potential to substantially limit a major life activity."); Chandler v. City of Dallas, 2 F.3d 1385, 1390 (5th Cir.1993) (corrected vision not a disability); Schluter v. Industrial Coils, Inc., 928 F.Supp. 1437, 1445

(W.D.Wis.1996); Coghlan v. H.J. Heinz Co., 851 F.Supp. 808, 813 (N.D.Tex.1994) (EEOC's interpretive guidance directly at odds with clear statutory language of ADA requiring substantial limitation).

In rejecting the interpretation offered by the EEOC, the court in Schluter stated:

[T]he crucial determination becomes whether the EEOC guidance is correct that the disability inquiry should be made without regard to the ameliorative effects of medication. The EEOC's guidance is not binding on the court. See, e.g., Coghlan v. H.J. Heinz Co, 851 F.Supp. 808, 812 (N.D.Tex.1994) (EEOC guidance not a binding regulation but simply a statement of what the agency thinks the statute means). Recognizing this, plaintiff notes that the Court of Appeals for the Seventh Circuit has cited the EEOC's guidelines with approval in Roth [v. Lutheran General al Hosp.], 57 F.3d [1446] at 1454 [7th Cir.1995]. Plaintiff also cites several decisions in which courts have applied the EEOC guidelines and concluded that an insulin-dependent diabetic is disabled under the act. Pater v. Deringer Manufacturing Co., 1995 WL 530655 at *4, 4 AD Cases 1840 (N.D.Ill. Sept. 7, 1995) (diabetic disabled because without medication diabetes is life-limiting); Sarsycki v. United Parcel Service, 862 F.Supp. 336, 340 (W.D.Okla.1994) (without insulin plaintiff would be unable to perform major life functions).

Although agency interpretations are to be given deference, see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), in this instance the EEOC's interpretation is in direct conflict with the language of the statute that requires plaintiffs in ADA cases to show that an impairment "substantially limits" their lives. 42 U.S.C. § 12102(2)(A). See Public Employees Retirement System v. Betts, 492 U.S. 158, 171, 109 S.Ct. 2854, 2863–64, 106 L.Ed.2d 134 (1989) ("[O]f course no deference is due to agency interpretations at odds with the plain language of the statute itself."). If an insulin-dependent diabetic can control her condition with the

use of insulin or a near-sighted person can correct her vision with eyeglasses or contact lenses, she cannot argue that her life is substantially limited by her condition. To say that a person who needs insulin or eyeglasses is disabled in fact is to read out of the act's first definition of disability the requirement that it applies only to those persons who are "substantially limited" in major life activities.

928 F.Supp. at 1445.

This court joins other courts that have rejected this portion of § 1630.2(j) of the EEOC Interpretative Guidance. Because the plain language of the ADA conflicts with the EEOC's Interpretative Guidance, the court concludes that Murphy's impairment should be evaluated in its medicated state.

■ Having determined that Murphy's impairment should be evaluated in its medicated state, the court will now turn its attention to the issue of whether Murphy has presented sufficient evidence for a rational factfinder to conclude that his high blood pressure constitutes a disability under the ADA. In *Deghand v. Wal–Mart Stores, Inc.*, 926 F.Supp. 1002 (D.Kan.1996), this court considered the issue of whether a plaintiff's high blood pressure constituted a disability under the ADA. In *Deghand* the plaintiff claimed that her high blood pressure was a disability under the ADA. This court granted the defendant's motion for summary judgment, finding that

[t]he plaintiff has not come forth with any evidence, much less competent and unambiguous medical evidence, that her high blood pressure substantially limited any one or more of her major life activities. Not surprising, other courts too have found that similar disability claims lacked evidence and, therefore, have held that high blood pressure, by itself, typically is not a disability within the meaning of the Act. *Oswalt v. Sara Lee Corp.*, 889 F.Supp. 253, 257 (N.D.Miss.1995) (citations omitted), *aff'd*, 74 F.3d 91 (5th Cir.1996). The Fifth Circuit said:

According to Oswalt, his physical impairment was his high blood pressure, and this impairment substantially limited a major life activity when his doctor au-

thorized him to miss work while he adjusted to medication.

. . . . .

In this case, Oswalt has provided no evidence to show that either the high blood pressure or the alleged side effects from the medication substantially limited his job. We agree with the district court that "[h]igh blood pressure alone, without any evidence that it substantially affects one or more major life activities, is insufficient to bring an employee within the protections of the ADA." *Oswalt*, 889 F.Supp. at 258. We do not imply that high blood pressure in general can never be a "disability," as defined by the statute. We hold only that Oswalt failed to provide any evidence that his high blood pressure substantially limited a major life activity.

74 F.3d at 92. Like Oswalt, the plaintiff here wants the finding of disability based on nothing more than a physician's general diagnosis without any evidence that the plaintiff's condition substantially limited her work activity. In addition, the medical leave slips that Deghand submitted say simply that she is excused from work "to run tests" or "due to testing." (Dk. 44, Dep. Ex. 16 and 17). The slips, therefore, are not proof that the hypertension itself was the reason for Deghand's medical leave of absence rather than the temporary condition of testing or adjusting to medication. *See Oswalt v. Sara Lee Corp.*, 889 F.Supp. at 257. The defendant is entitled to summary judgment on this claim.

926 F.Supp. at 1013. *See Aucutt v. Six Flags Over Mid–America, Inc.*, 85 F.3d 1311, 1319 (8th Cir.1996) (plaintiff who failed to present any evidence indicating that his angina, high blood pressure, and coronary artery disease placed a significant restriction on his ability to perform any of the basic functions enumerated in 29 U.S.C. § 1630.2(i) not disabled with the meaning of 42 U.S.C. § 12102(2)(A)).

Based upon the evidence presented, the court finds that a rational factfinder would be unable to conclude that Murphy's high blood pressure constitutes a disability under

§ 12102(2)(A). The dearth of medical evidence supporting his disability claim coupled with intermittent effects personally attributed by Murphy to his high blood pressure is insufficient to establish the existence of a disability. The only limitation specifically set by Murphy's treating physician—the 200 pound lifting restriction—is not of such a nature as to significantly restrict him in his ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. In short, Murphy's high blood pressure and its concomitant effects do not constitute a disability under the ADA. *See Bridges v. City of Bossier,* 92 F.3d 329 (5th Cir.1996) (disqualification from narrow range of jobs involving routine exposure to extreme trauma—such as a firefighter—does constitute a disability under ADA); *Wooten v. Farmland Foods,* 58 F.3d 382, 384 (8th Cir.1995) (medical restrictions of "light duty—no work with meat products—no work in cold environment—lifting 10 lbs. frequently 20 lbs. maximum" insufficient to establish that plaintiff was disabled within the meaning of the ADA); *Hamm v. Runyon,* 51 F.3d 721, 725 (7th Cir.1995) ("Under the ADA, 'intermittent, episodic impairments are not disabilities.'") (quoting *Vande Zande v. Wisconsin Dept. of Admin.,* 44 F.3d 538, 544 (7th Cir. 1995)); *Stone v. CGS Distribution, Inc.,* 52 F.3d 338 (10th Cir.1995) (Table); *Bolton,* 36 F.3d at 942–44 (impairments including pain, numbness and limited ability to lift weight (no lifting of objects larger than 50 pounds overhead) did not show that plaintiff was restricted from performing a class of jobs).

**Even if Murphy was not disabled, did UPS nevertheless regard Murphy as Disabled?**

Murphy contends that even if he is not disabled, UPS regarded him as such, and therefore under 42 U.S.C. § 12102(2)(C) he still presents a viable ADA claim. UPS responds, arguing that it did not regard Murphy as disabled but only that he was not certifiable under DOT regulations. As discussed below, the court concludes UPS did not regard Murphy as disabled, only that he was not certifiable under DOT regulations. *See Campbell v. Federal Exp. Corp.,* 918 F.Supp. 912, 920 n. 10 (D.Md.1996) ("As a

matter of law, Federal Express has neither 'relied on a record' of Campbell's medical history, nor did Federal Express 'regard' Campbell as 'disabled'; it regarded him as not certifiable under DOT regulations.").

Although the court could end its analysis here, the court will briefly address the other issues raised by the parties.

**Was Murphy a "qualified individual" within the meaning of the ADA?**

UPS contends that Murphy was not a qualified individual for the mechanic position due to his high blood pressure. Murphy to suggest that he was qualified for the mechanic position and that driving a commercial vehicle was not an essential function of the job. Murphy also suggests that most of his driving would have simply been a spin around the block and that UPS should have let him continue to drive in the capacity of mechanic, despite the fact that he was erroneously certified. Murphy also contends that he did possess a DOT certification card and therefore he was qualified for the UPS position. Murphy contends that UPS should have assigned the driving functions to another employee.

**Essential Functions of the Job**

■ "The initial inquiry in determining whether a job requisite is essential is whether an employer actually requires all employees in the particular position to perform the allegedly essential function." *Milton,* 53 F.3d at 1124 (citing 29 C.F.R. Pt. 1630, App. § 1630.2(n)). "An employer's judgment is also relevant evidence to be considered, as are the terms of any collective bargaining agreement." *Id.* "This inquiry is not intended to second guess the employer or to require him or her to lower company standards." *Id.*

Murphy's attempts to demonstrate that driving the trucks was not an essential function are unavailing. The court is satisfied that no rational factfinder could conclude that driving the vehicles during both road tests or road calls was not an essential function of the mechanic's job at UPS. It takes no stretch of the imagination to believe that a mechanic would be expected to check the

efficacy of his repairs. One would generally expect a mechanic who has made repairs to the brakes of a commercial vehicle would road test his work product before returning the vehicle to the UPS delivery fleet. Similarly, delivering working and retrieving disabled vehicles does not strike the court as an aberrant expectation of an employer such as UPS.

■ As to Murphy's suggestion that the essential function of driving the commercial vehicles should have been assigned to another employee, the ADA does not impose that obligation upon employers. *See Milton,* 53 F.3d at 1124 ("An employer is not required by the ADA to reallocate job duties in order to change the essential function of a job. *See* 29 C.F.R. Pt. 1630 App. 1630.2(*o*); *Gilbert v. Frank,* 949 F.2d 637, 644 (2d Cir.1991). An accommodation that would result in other employees having to worker (sic) harder or longer hours is not required."); 29 C.F.R. Pt. 1630, App. 1630.2(*o*) ("It should be noted that an employer is not required to promote an individual with a disability as an accommodation."); *Rhodes v. Bob Florence Contractor, Inc.,* 890 F.Supp. 960, 967 (D.Kan.1995).

■ Acceptance of Murphy's alternative argument—that UPS should have simply allowed him to continue driving on the erroneously issued DOT certification—would set a dangerous precedent. Once UPS learned that Murphy's DOT certification had been issued in error, it could not simply overlook that fact. Placing an uncertified person behind the wheel of one of its vehicles would have potentially exposed UPS to civil and criminal liability. *See Chandler,* 2 F.3d at 1395 ("Woe unto the employer who put such an employee behind the wheel of a vehicle owned by the employer which was involved in a vehicular accident."). The ADA does not require an employer to accommodate a person's disability by ignoring other duties imposed by law. Nor has Murphy refuted UPS' contention that there are no provisions for obtaining a waiver of the DOT blood pressure standards.

■ To the extent that Murphy suggests that UPS should have given him an indefinite amount of time to lower his blood pressure,

the ADA apparently imposes no such obligation on an employer. *See Myers v. Hose,* 50 F.3d 278, 283 (4th Cir.1995) ("Nothing the text of the reasonable accommodation provision requires an employer to wait an indefinite period for an accommodation to achieve its intended effect."). Moreover, the uncontroverted facts demonstrate that at the present time and for the foreseeable future there is no way for Murphy to function if his blood pressure is lowered to the level required by the DOT standards. UPS was not required to retain Murphy on the slim prospect that his lifelong condition might someday in the distant future be controlled.

### Is UPS' compliance with DOT regulations a complete defense?

■ UPS contends that its compliance with DOT regulations is a complete defense to Murphy's ADA discrimination claim. In support of that contention, UPS cites *Campbell v. Federal Exp. Corp.,* 918 F.Supp. 912 (D.Md.1996). In pertinent part, the court in *Campbell* stated:

> It is undisputed that Federal Express may rely on DOT regulations as a defense to an ADA discrimination claim. The regulations implementing the ADA provide:
>
> > If the alleged discriminatory action was taken in compliance with another Federal law or regulation, the employer may offer its obligation to comply with the conflicting standard as a defense. The employer's defense of a pretext, or by showing that the Federal standard did not require the [alleged] discriminatory action, or that there was a nonexclusionary means to comply with the standard that would not conflict with [the ADA].
>
> 29 C.F.R.App. § 1630.15(e). Moreover, the legislative history of the ADA includes the following admonishment from Congress:
>
> > With respect to covered entities subject to rules promulgated by the Department of Transportation regarding physical qualifications for drivers of certain classifications of motor vehicles, it is the Committee's intent that a person with a disability applying for or currently holding a job subject to these standards

**884**

must be able to satisfy any physical qualification standard that is job related and consistent with business necessity in order to be considered a qualified individual with a disability under Title I of this legislation.

H.R.Rep. No. 101–485(II), 101st Cong., 2d Sess. 57 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 339. Thus, it is plain that in the absence of a showing of pretext, and provided the DOT certification is "job related" and consistent with "business necessity," Campbell's failure to obtain the required DOT certification is a complete defense to his claim.

918 F.Supp. at 917. Because there is no evidence demonstrating that UPS' reliance on the DOT regulations was pretextual, and because the qualification standard was clearly job related, UPS' reliance on the DOT regulations is a defense to Murphy's ADA claims.

**Assuming, arguendo, that compliance with DOT regulations is not a complete defense, was there a reasonable accommodation that would have enable Murphy to perform the essential functions of the job?**

Even if UPS' obligation to comply with DOT regulations was not a complete defense to Murphy's ADA claim, Murphy has not sufficiently refuted UPS' evidence that his continued employment would have been an undue hardship on UPS.

IT IS THEREFORE ORDERED that UPS' motion for summary judgment (Dk.39) is granted. The clerk of the court shall enter judgment in favor of the defendant UPS.