**Lawrence D. STUBBS, Plaintiff,**

v.

**MARC CENTER, a not-for-profit Illinois corporation, Defendant.**

No. 95–1401.

United States District Court, C.D. Illinois.

Jan. 21, 1997.

Kim L. Spaits, Saint & Carmichael, Bloomington, IL, for plaintiff.

Keith J. Braskich, David G. Lubben, Keck Mahin & Cate, Peoria, IL, for defendant.

### *ORDER*

McDADE, District Judge.

Defendant Marc Center ("Center") is a not-for-profit organization providing services to disabled individuals. In an ironic twist, one of its employees, Lawrence B. Stubbs ("Stubbs"), has filed a Complaint against the Center for violating the Americans with Disabilities Act (ADA). Presently before the Court is Defendant's Motion for Summary Judgment [Doc. # 28].

### *FACTUAL BACKGROUND*

On September 27, 1994, Stubbs was hired by Marc Center to be its Finance Director. This job is a pivotal management position

within the Center. One of Stubbs' essential duties was the preparation of the Center's annual budget, which totals approximately five million dollars. At the time Stubbs was hired, the Center was incurring a $100,000 budget deficit. Stubbs had never before prepared a budget for a not-for-profit social service agency and had no prior experience in dealing with accounting, budgeting, or financial management of the revenue sources of the Center. The Center's fiscal year runs from January 1 to December 31. The annual budget is usually prepared during the period between October and December of each calendar year. Thus, when he was hired in late September, Stubbs' main task was the preparation of the budget.

The budget preparation process involves, among other things, meeting with individual administrators and groups of administrators, formatting the Center's computer program, creating spreadsheets, and distributing budget worksheets to various administrators. The budget process also requires the Finance Director to have access to the Center's mainframe computer in order to "link" it to various software systems. According to the Center, its mainframe computer operates on a different operating system than standard personal computers. Thus, Stubbs could not have accessed the Center's computer from home via a modem. Instead, he would have needed an AS–400 system in his home with an actual cable hookup, which costs about $40,000. Stubbs disputes this fact. Claiming to have experience in data entry from a modem into the mainframe use of a computer, he believes that it was possible for him to have linked into the mainframe computer from his personal computer at home.[1]

Preparation of the budget is a duty of the Finance Director over and above his regular day-to-day duties. These duties required Stubbs to be outside of his office fifty percent of time. Stubbs would go to employees' job sites, review what they actually did, and meet with various administrators in their offices. During this initial period at the Center, Stubbs met almost every day with Executive Director Servey, Business Manager Edmiaston, and the clerical employees he supervised. He also would review and sign off on all of the employees' timecards each day and personally authorize time off for his subordinates depending on the work flow on that particular day. In the past, the combined duties of the Finance Director position during the budget season had required the Finance Director to work 70 to 80 hours per week, including weekends.[2]

On October 23, 1994, only 21 days after he had begun his employment with the Center, Stubbs suffered a heart attack which required his hospitalization. Prior to this time, Stubbs had been working 50 to 60 hours a week on his regular day-to-day activities as well as on reviewing manuals and learning how to perform his job duties. Stubbs admits that at the time of his heart attack, he was still in a "learning curve," but that he had completed eighty percent of his work in reviewing the Center's operational manuals and computer systems. However, he had not yet begun working on the budget.

Stubbs had a successful bypass operation within one or two days of his heart attack. After this operation, the Center's Executive Director Charles Servey ("Servey") testified that Stubbs' wife told him Stubbs would not be returning to work for eight to twelve weeks. He thus assumed that Stubbs "was strapped to machines and otherwise and incapacitated, at least for eight to twelve weeks." Stubbs' wife denies having made this statement.

In fact, Stubbs stayed in the hospital for only one week to recuperate. While he was

1. While it is unclear from the testimony presented whether Stubbs had an adequate foundation for this opinion, the Court will construe all disputed facts in his favor because he is the nonmovant here.

2. While Stubbs contests that he would have had to work this same number of hours in order to complete the budget, he offers no proof of this fact besides his own affidavit. In light of his

inexperience in preparing a budget for a not-for-profit social service agency and in dealing with accounting, budgeting, or financial management of the revenue sources of the Center, this self-serving statement does not contain an adequate foundation. Moreover, nowhere in his affidavit does Stubbs directly state that he could have completed his duties in under 70 to 80 hours per week.

still in the hospital, Executive Director Servey told him that he would be recommending Stubbs' termination to the Board of Directors. Stubbs' only response was, "I didn't think it was fair. That I would be back to work within a matter of weeks." Stubbs clarified that he had said he could return in three to four weeks because that was what the doctors had led him to believe. After Stubbs was discharged from the hospital on November 1, 1994, he had another conversation with Servey in which he asked Servey whether he could return to work within two weeks if he was feeling well. Servey cut him off and said that Stubbs had already been terminated on October 31, 1994, but that he could reapply for the position if he wished. At some point during all this, Stubbs moved to a new home within three blocks of the Center.

Stubbs admits that he could not work at all for two weeks following his operation. At the beginning of the third week after the operation, Stubbs' co-worker, Karen Edmiaston, ran into Stubbs at a Wal–Mart store and spoke with him for about an hour. She described him as looking physically tired. She testified that he walked into the store and then was given a special cart in which to ride. Stubbs explained to her that he was in a wheelchair at that time because he could not get around stores.

Also about two weeks after his operation, Stubbs went to see his doctor, Dr. Hoy, for a follow-up visit. Stubbs asked him if he could return to work and Dr. Hoy said he would leave that up to Stubbs' discretion. Dr. Hoy did say, however, that Stubbs "would not be able to put in an eight hour day" and that he could only perform a light workload and would need to rest. Sometime after this point, Stubbs had a minor stroke which affected his back and prevented him from driving.

Stubbs submitted an affidavit dated December 19, 1996, in which he states in pertinent part:

7. Based upon my experience in budgeting and with my knowledge of financial control functions I was able to perform the essential functions of my job within one week after my release from the hospital. The budget would have been completed in time for the December Board meeting.

8. I was able to perform work on premises at Marc Center within one week after my termination from employment. I could have worked a 40–hour plus week at Marc Center with periods of rest. The pattern would have continued for approximately two weeks when I would have been strong enough to sustain longer overtime hours of work.

In his deposition, Stubbs testified that three weeks after his operation, he was able to work for periods of two to three hours before needing one to one-and-a-half hour periods of rest.

After terminating Stubbs on October 31, 1994, Executive Director Servey anticipated being able to fill the Finance Director position within thirty days by going back to the pool of previous applicants who had applied along with Stubbs. Stubbs did not reapply for the position, explaining that he did not understand why he should reapply when he already had the job. In mid-December 1994, the Center hired Linda Tuttle as the new Finance Director, and she began to work there on January 3, 1995.

Tuttle immediately began to prepare the Center's budget, working 70 to 80 hours per week, including weekends, until approximately March of 1995. She also had to perform her day-to-day duties during this time. On some days, she worked from eight o'clock in the morning until eight or ten o'clock at night. Her first task was to format the computer programs and put the financial data from 1994 into spreadsheet format. She then distributed these spreadsheets to team administrators and had various meetings with them. The Center's budget was finalized in mid-April 1995, four months late.[3]

Tuttle testified that Stubbs probably would not have been able to adequately perform his

---

**3.** A number of staff were laid off at this time. However, it is unclear whether these layoffs were the result of the untimely budget itself or other factors such the Center's deficit in operating income.

job duties from his home because most of the meetings during the budgetary period were group meetings where cutbacks were being discussed for salaried workers. Many of these meetings were behind closed doors and would not have been appropriately handled over the telephone. Moreover, problems would have existed with transferring information between the Center's computer and his home. Similarly, Business Manager Karen Edmiaston testified that it would have been too inconvenient to have allowed information to be sent home to Stubbs because a lot of that information was used by other workers throughout the week and they may have needed it at the same time. Edmiaston also stated that the Finance Director job was a "crisis position ... where you do things as things come up from staff. The majority of the time is you answering questions and helping the other people, other administrative staff to solve problems, and to give them information. And I think that without contact of just being where he was being, I don't think [it] would have worked out."

Tuttle also testified that Stubbs probably would not have been able to effectively delegate his job duties to his co-workers or subordinates because they already had full-time positions. Stubbs himself testified that these co-workers all worked full-time and were constantly busy at their jobs.

### ANALYSIS

"A motion for summary judgment is not an appropriate occasion for weighing evidence; rather, the inquiry is limited to determining if there is a genuine issue for trial." *Lohorn v. Michal,* 913 F.2d 327, 331 (7th Cir.1990); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). This Court must "view the record and all inferences drawn from it in the light most favorable to the party opposing the motion." *Holland v. Jefferson Nat. Life Ins. Co.,* 883 F.2d 1307, 1312 (7th Cir.1989). When faced with a motion for summary judgment, the nonmoving party may not rest on its pleadings. Rather, it is necessary for the nonmoving party to demonstrate, through specific evidence, that there remains a genuine issue of triable fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

The ADA proscribes discrimination against only "qualified individual[s] with a disability."[4] *Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 563 (7th Cir.1996); 42 U.S.C. § 12112(a). A "qualified individual with a disability" is defined in relevant part as: "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(9). Determining whether someone meets this definition involves a two-step analysis: First, does the individual satisfy the prerequisites for the position? Second, can the person perform the essential functions of the position with or without reasonable accommodation? *Bombard,* 92 F.3d at 563 *citing* 29 C.F.R.

---

4. For purposes of this summary judgment motion, the parties do not dispute that Plaintiff was "disabled" under the ADA, only that he is a "qualified individual" under the Act. A person is "disabled" under the ADA if he has (1) a physical or mental impairment which substantially limits one or more of the major life activities; (2) a record of such impairment; or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(2). The Court notes, however, that Plaintiff's relatively short and temporary absence from work probably did not constitute a true "disability" under the ADA. Intermittent, episodic impairments are not disabilities, the standard example being a broken leg. *Vande Zande v. State of Wisc. Dept. of Adm.,* 44 F.3d 538, 544 (7th Cir.1995) *citing* 29 C.F.R. § 1630.2(j); *see also Katz v. City Metal Co., Inc.,* 87 F.3d 26, 31–32 (1st Cir.1996) (finding that it was jury question whether Plaintiff's condition following his heart attack and angioplasty procedures was enough to conclude that he "suffered from a continuing medical condition, *persisting beyond the period immediately after the operation,* that substantially limited one or more of his major life activities") (emphasis added); *McDonald v. Commonwealth of Pennsylvania, Dept. of Public Welfare, Polk Ctr.,* 62 F.3d 92, 96 (3d Cir.1995) (refusing to find Plaintiff "disabled" where she was unable to work for two months following surgery for severe abdominal pain). Nevertheless, Servey's perception that Stubbs "was strapped to machines and otherwise [ ] incapacitated, *at least* for eight to twelve weeks," (emphasis added) may have presented a jury question as to whether Stubbs was "disabled" under the statute. *See Katz,* 87 F.3d at 32–33; 42 U.S.C. § 12102(2).

§ 1630.2(m). This determination must be made as of the time of the employment decision and the plaintiff bears the burden of proof on this issue. *Id.*

■ There is no dispute that Stubbs was qualified for the Finance Director position in terms of his job skills and experience. After all, he had already been hired by the Center and had performed adequately during the twenty-one days that he worked there. Rather, the dispute centers upon the second prong of the analysis: whether he could perform the essential functions of the Finance Director position with or without reasonable accommodation? Defendant answers that question "no" because Stubbs' complete absence from the workplace during his period of recovery precluded him from performing any of the essential functions of his position. Plaintiff retorts that a reasonable accommodation would include some leeway for a period of recovery after a major operation.

■ The Court finds some merit in Plaintiff's view, but concludes that it is not enough to assist Plaintiff under the particular facts of this case. While most courts give lip service to the idea that the "qualified individual" analysis must be made at the time of the adverse employment decision, *see, e.g., id.; Griffith v. Wal–Mart Stores, Inc.,* 930 F.Supp. 1167, 1170 (E.D.Ky.1996); *Parker v. Metropolitan Life Ins. Co.,* 875 F.Supp. 1321, 1326 n. 5 (W.D.Tenn.1995), *aff'd in part, rev'd in part,* 99 F.3d 181 (6th Cir.1996), the more complete view appears to be that espoused by the Fourth Circuit in *Myers v. Hose,* 50 F.3d 278, 283 (4th Cir.1995): "[R]easonable accommodation is by its terms most logically construed as that which presently, *or in the immediate future,* enables the employee to perform the essential functions of the job in question." (emphasis added).[5]

Assume, for example, that X is a factory worker whose job duties do not necessitate any real contact with his co-workers or the public. X suffers a minor heart attack but is ready to return to work the next day. However, upon hearing the news, X's employer perceives X to be disabled for an indefinite period of time and immediately terminates him. Such a case would appear to present at least a triable issue of fact as to whether X's absence for one day prevented him from performing the essential functions of his position.

This conclusion comports with those cases involving the effects of absenteeism upon the "qualified individual" analysis. In such cases, it is the employee's failure to meet the attendance requirements of the job, i.e. *frequent* absences, that determine whether he or she can be considered a "qualified individual" protected by the ADA. *See, e.g., Tyndall v. National Educ. Ctrs. Inc. of California,* 31 F.3d 209, 213 (4th Cir.1994); *Matzo v. Postmaster Gen.,* 685 F.Supp. 260, 263 (D.D.C.1987), *aff'd,* 861 F.2d 1290 (D.C.Cir. 1988). By contrast, a single, short absence from work does not prevent such an individual from being "qualified" under the ADA and performing his or her essential functions "in the immediate future." *Myers,* 50 F.3d at 283. Thus, while the time of the employment decision will usually be the appropriate time for determining when an individual can perform the essential functions of the job, there may be rare instances in which the employer makes an irrational decision based upon an improper perception of the employee's illness. In such cases, some point in time beyond the termination date may be a more appropriate measure.

None of this rhetoric helps Plaintiff here. It is undisputed that Stubbs could not work at all for a period of two weeks following his bypass operation and on a limited basis for at least two weeks after that. This fact alone precludes Stubbs from consideration as a "qualified individual" under the ADA. It is simply not reasonable for an employer to have to do without one of its most pivotal management positions during the most critical time of the year. It is undisputed that the Finance Director was responsible for preparing the annual agency budget between October and December of each year and that Stubbs was at less than full capacity for at

---

**5.** *See also Hudson v. MCI Telecommunications Corp.,* 87 F.3d 1167, 1169 (10th Cir.1996) ("This court agrees with plaintiff that a reasonable allowance of time for medical care and treatment may, in appropriate circumstances, constitute a reasonable accommodation.").

least four weeks during this critical time period. To compound this problem, Stubbs admittedly was still only learning the basic duties of his job and could not operate as efficiently as someone with more experience in the social services area. Under such circumstances, it was not unreasonable for the Center to conclude that Stubbs should be terminated in favor of another viable candidate.

Plaintiff's proposed accommodations are all unreasonable because they would not allow him to perform the essential functions of his position as required by the ADA. First, Stubbs proposes that he could have worked modified hours and still have completed the budget by the December Board meeting. Such an accommodation is both speculative and unrealistic. Stubbs was completely incapacitated for the first two weeks after his operation. He contends that during the third and fourth weeks, he could have worked "a forty hour plus week with rest periods. This would have entailed working weekends. After the two week period, Mr. Stubbs could have worked longer overtime hours."

It cannot reasonably be disputed that completing both the daily duties and budget preparation duties of the Finance Director took seventy to eighty work hours each week for a period of approximately three months.[6] This translates to approximately 840 to 960 manhours. Even subtracting his daily duties for five weeks[7] at approximately 40 hours per week (a generous estimate), this yields 640 to 760 manhours. Stubbs had not yet begun the budget preparation process prior to his heart attack. Thus, the earliest date he could have begun to work on it was the second week of November (two weeks after his operation). During the next two weeks, Stubbs could work approximately forty hours a week, including weekends, because of his need for further rest.[8] Let us even assume he could work fifty hours for each of these weeks. This would leave him in the last week of November with the prospect of making up 540 to 660 manhours in approximately a one month period. Using the lower estimate of 540 manhours, this would require that he work an average of eighteen hours a day for thirty consecutive days. Even a superhuman would find it difficult to perform such a task, let alone a recovering heart attack victim.[9] While these numbers are obviously hypothetical, they prove the Court's point that Stubbs' proposed accommodation is simply unrealistic and therefore unreasonable.

It is also unreasonable in the sense that Stubbs' complete absence for two weeks and his restricted work schedule for the following two weeks would no doubt take away from his ability to adequately perform his day-to-day duties in the office. The Finance Director position is a pivotal management position requiring interaction with co-workers and subordinates more than half of the time. Especially during his initial period at the Center, Stubbs would meet almost every day

6. Both the Finance Director before Stubbs and the Finance Director after Stubbs worked seventy to eighty hour workweeks, including weekends, in order to complete the budget and conduct their regular daily activities in a timely manner. As noted above, there is no reason to believe that Stubbs would not also have to work such lengthy hours in order to adequately perform his job duties, especially in light of the fact that he was still in a learning curve at this time. The Court does not accept Plaintiff's argument that Stubbs' replacement, Linda Tuttle, was not as seasoned in the budgeting process as Stubbs. Tuttle had completed annual budgets for two or three former clients. Thus, at best, Stubbs and Tuttle were both on a learning curve when they arrived at the Center. Moreover, the Finance Director prior to Stubbs had also worked lengthy hours to complete the budget, implying that it was the task itself, rather than the Finance Di-

rector's experience, which mainly dictated the length of time necessary to complete it.

7. This accounts for the first three weeks in which Stubbs worked at the Center and two weeks in which he was completely absent from the Center while recovering from his operation.

8. During this two week period, Stubbs could only work for two to three hours at a time before requiring an hour to hour-and-a-half rest period. Dr. Hoy also told Stubbs that he "would not be able to put in an eight hour day."

9. The fact that Stubbs was briefly seen by a co-worker walking into a Wal–Mart store during this period of time or could perform certain household chores does nothing to prove his ability to maintain such an excruciating work schedule.

with Executive Director Servey, Business Manager Edmiaston, and the clerical employees he supervised. He also would review and sign off on all of the employees' timecards each day and personally authorize time off for his subordinates depending on the work flow on that particular day.

An effective work atmosphere necessitates that such a person be present during scheduled work hours in order to handle various daily tasks and problems that may arise and to interact with others in the workplace. Stubbs' noticeable absences for his rest periods during the middle of the workday would have been inconvenient for his co-workers and his employer. This case stands in sharp contrast to the lonely factory worker described in the earlier hypothetical.

■ For similar reasons, Stubbs' second proposed accommodation to work from home also is unreasonable. An employer is generally not required to accommodate a disability by allowing a disabled worker to work at home. *Vande Zande*, 44 F.3d at 544. This is because most jobs involve teamwork without which their quality and productivity would be greatly reduced. *Id.* at 544–45. Thus, it is only an extraordinary case in which working at home would constitute a reasonable accommodation under the ADA. *Id.* at 545. This is not such a case.

As noted above, a good portion of Stubbs' job duties required him to remain on the Center's premises most of the time. He had to meet with various individual administrators and groups of administrators behind closed doors, a task not easily accomplished over the telephone where the materials might not have been immediately available to him and where secrecy might not be as certain. Stubbs' job duties also required him to solve the various crises which his staff might encounter each day. Without having extensive experience at the Center, it would have been exceedingly difficult to accomplish this task from home. What if he could not be reached by phone or was engaged in one of his rest periods at such a crucial time? There also would exist problems with sharing information if Stubbs took certain documents home that his co-workers needed to use on short notice. Of course, they could run to his home three blocks away, but this would not be a reasonable accommodation.

Even more telling is Plaintiff's own admission that the only tasks he would have accomplished by working at home would have been "completing his reading of Marc Center manuals and reviewing restrictions on funding agencies and calculating numbers on populations generated for dollars on the budget." Thus, by staying home, Plaintiff would not be able to perform all of the essential duties of his position (i.e. those which require personal interaction or physically being present at the workplace). This is not enough to render him qualified for his position under the ADA.

■ Finally, Stubbs' attempted accommodation to temporarily shift his duties to his co-workers and subordinates is unreasonable as a matter of law. *See Cochrum v. Old Ben Coal Co.,* 102 F.3d 908, 912 (7th Cir.1996) ("[H]iring a helper to perform the overhead work would mean the helper would de facto perform Cochrum's job. We cannot agree that Cochrum would be performing the essential functions of his job with a helper."); *Gilbert v. Frank,* 949 F.2d 637, 644 (2d Cir. 1991) (assigning other postal employees to do the plaintiff's heavy work not a reasonable accommodation); *Treadwell v. Alexander,* 707 F.2d 473, 478 (11th Cir.1983) (assigning other park technicians to perform the plaintiff's duties would impose an undue hardship on employer); *Reigel v. Kaiser Foundation Health Plan of North Carolina,* 859 F.Supp. 963, 973 (E.D.N.C.1994). Moreover, it is undisputed that Stubb's co-workers were all working full-time and were very busy with their own work; thus, they had no ability to assist Stubbs' in his own duties.

■ The Court finds that the Center acted reasonably when it terminated Stubbs on October 31, 1994. At the time of his termination, and for approximately three weeks afterward, Stubbs was not able to perform the essential functions of his job. Moreover, given his medical restrictions, it would have been virtually impossible for Stubbs to have completed the budget in a timely manner. Like the Rehabilitation Act, the ADA forbids discrimination based on stereotypes about a handicap, but it does not forbid decisions

based on the actual attributes of the handicap. *Anderson v. University of Wisc.*, 841 F.2d 737, 740 (7th Cir.1988). That is what occurred here.

Stubbs' argument that his replacement, Linda Tuttle, was not hired until mid-December 1994 and the budget was not completed until mid-April 1995 does not change this conclusion. This is an after-the-fact analysis which does not bear upon whether Defendant intentionally discriminated against Plaintiff at the time of the decision to terminate him on October 31, 1994. It is undisputed that Stubbs could not resume his essential job duties "in the immediate future" period following his termination. *Myers*, 50 F.3d at 283. Because of this fact, Stubbs was not a "qualified individual with a disability" and was no longer protected by the ADA.

In summary, because Plaintiff could perform none of his essential job functions for a period of two weeks after his operation, and thereafter could not reasonably perform his essential functions with or without a reasonable accommodation, the Court finds that Plaintiff is not a "qualified individual with a disability" under the ADA.[10] Thus, summary judgment is granted in favor of Defendant.

### CONCLUSION

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment [Doc. # 28] is **GRANTED.** The Clerk is ordered to **TERMINATE** this case.

---

**10.** Consequently, Defendant had no affirmative duty to suggest reasonable accommodations under the ADA where no such accommodations were possible. The Court does not reach the question whether Plaintiff met his burden to request a reasonable accommodation from his employer.