Daniel F. THOMS, Plaintiff,

v.

ABF FREIGHT SYSTEM,
INC., Defendant.

No. 96–C–1415.

United States District Court,
E.D. Wisconsin.

June 30, 1998.

Thomas G. Halloran, Waukesha, WI, for Plaintiff.

Charles G. Jackson, Theodore C. Stamotakos, for Defendant.

## DECISION AND ORDER

ADELMAN, District Judge.

The question in this case is whether ABF's termination of Daniel F. Thoms's employment following Thoms's diagnosis of insulin-dependent diabetes mellitus violated the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* Currently before me is ABF's motion for summary judgment on the matter.

## I. FACTUAL BACKGROUND

The following facts are undisputed unless otherwise noted; they generally derive from the proposed findings of fact of the parties to the extent they are uncontested.

ABF is a motor carrier with a network of 330 terminals in all 50 states, Canada and Puerto Rico. The Interstate Commerce Commission (which has been succeeded by the Surface Transportation Board) recognized ABF as a General Commodities Common Carrier that operates in interstate commerce. ABF does not dispute it is an employer within the meaning of the ADA. *See* 42 U.S.C. § 12111(5).

ABF generally operates two types of terminals: break bulk terminals and local terminals. ABF's break bulk terminals are large facilities that serve as regional consolidation points for freight. At break bulk terminals dock laborers remove freight from trailers with nation-wide points of origin and then consolidate the freight onto outgoing trailers with largely nation-wide destinations. Local terminals generally are smaller than break bulk terminals and service a local geographi-cal area. At local terminals dock laborers unload freight from trailers with nation-wide points of origin (usually from the break bulk terminals) and load the freight onto outgoing trailers generally having local destinations. Dock workers at local terminals also load freight that has been picked up from local customers onto outgoing trailers destined for locations nation-wide.

ABF operates a local terminal in Milwaukee. Non-management employees at the Milwaukee terminal fall into only two categories: clerical workers or driver/dock laborers. ABF does not maintain a purely dock laborer position or purely driver position at the Milwaukee terminal. Driver/dock laborers do both tasks. On the one hand they strip freight off incoming trailers and consolidate and load the freight onto outgoing trailers. On the other hand they drive tractor-trailers to pick up and deliver freight in the greater Milwaukee area.[1] At least a good portion of the freight handled and transported by ABF's Milwaukee driver/dock laborers originates from outside the state of Wisconsin. Driver/dock laborer duties also include "hostler" or "yard spotter" work, moving trailers within or around the terminal. ABF requires driver/dock laborers to perform the different functions as needed, even within the same shift.

At ABF pick-up and delivery drivers are distinguished from line-haul drivers, who transport freight long distances "over the road." ABF does not employ any line-haul drivers at its Milwaukee terminal.

All Milwaukee terminal driver/dock laborers are members of a bargaining unit represented by the International Brotherhood of Teamsters, Local "General" Union Number 200, for purposes of collective bargaining. The terms and conditions of the driver/dock laborers' employment are covered by collective bargaining agreements in effect between ABF and the union.

The Milwaukee terminal operations manager assigns work to regular employee driver/dock laborers in descending order of seniority; the most senior driver/dock laborer

---

1. Whether Milwaukee terminal driver/dock laborers occasionally make pickups and deliveries and/or move equipment outside of Wisconsin is disputed by plaintiff, although with little to no evidentiary support.

has first choice to accept or decline a particular assignment, then the next most senior driver/dock laborer has that option, and so forth down the seniority list. Due to the ebbs and flows of business, combined with the seniority-based system, the percentage of time a driver/dock laborer may spend on each job function is indeterminate.

In addition to its regular employees ABF uses "casual employees" as a supplemental work force to accommodate its constantly fluctuating employment and staffing needs. Under the labor agreement, casual employees do not have seniority, are not guaranteed any minimum number of hours per week, and may be called in any order to work at any time. The bargaining agreement allows the union to place certain casual employees on a "preferred casual list." Preferred casual employees differ from casual employees in that if ABF increases its workforce by hiring regular employees, it must hire a preferred casual employee before a casual employee; when preferred casual employees are hired as regular employees, ABF must make health and welfare benefit contributions immediately rather than waiting until satisfactory completion of a 30–day probation period; and preferred casuals hired as regular employees accrue seniority immediately, rather than having to wait for a 30–day probation period to expire.

Although their relevance to the current lawsuit is disputed, the parties agree that the United States Department of Transportation ("DOT") has promulgated certain Federal Motor Carrier Safety Regulations (the "FMCSRs"), "applicable to all employers,[2] employees,[3] and commercial motor vehicles,[4] which transport property or passengers in interstate commerce." 49 C.F.R. § 390.3 (1994).

As they read at the time of the events of this case, the FMCSRs mandated "minimum qualifications for persons who drive motor vehicles[5] as, for, or on behalf of motor carriers"[6] and the "minimum duties of motor carriers with respect to the qualifications of their drivers." 49 C.F.R. § 391.1 (1994). Specifically, the FMCSRs stated:

(a) A person shall not drive a motor vehicle unless he is qualified to drive a motor vehicle. Except as provided in § 391.63, a motor carrier shall not require or permit a person to drive a motor vehicle unless that person is qualified to drive a motor vehicle.

(b) Except as provided in subpart G of this part, a person is qualified to drive a motor vehicle if he—

\* \* \* \* \* \*

(6) Is physically qualified to drive a motor vehicle in accordance with subpart E—Physical Qualifications and Examinations of part 391....

49 C.F.R. § 391.11 (1994).

Title 49 C.F.R. § 391.41 (1994) established the physical standards all drivers had to meet to be considered "physically qualified" for a driver position. Under subsection 391.41(a), a "person shall not drive a motor

---

2. The FMCSRs define "employer", in pertinent part, as "any person engaged in a business affecting interstate commerce who owns or leases a commercial motor vehicle in connection with that business." 49 C.F.R. § 390.5 (1994).

3. The FMCSRs define "employee" as a "driver of a commercial motor vehicle." "Driver" "means any person who operates any commercial motor vehicle." 49 C.F.R. § 390.5 (1994).

4. The FMCSRs define "commercial motor vehicle" as "any self-propelled or towed vehicle used on public highways in interstate commerce to transport passengers or property when: (a) The vehicle has a gross vehicle weight rating or gross combination weight rating of 10,001 or more pounds...." 49 C.F.R. § 390.5 (1994). At all times relevant to this case, all of the tractor-trailers driven by Milwaukee Terminal driver/dock laborers had a gross vehicle weight rating of

more than 10,000 pounds and fully loaded tractor-trailers (i.e. the "combination weight rating") could weigh as much as 80,000 pounds. ABF's Statement of Material Facts at ¶ 23. Thoms thus does not dispute that as to weight ABF's trucks fall under the definition of "commercial motor vehicles".

5. Under the FMCSRs "[m]otor vehicle means any vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used upon the highways in the transportation of passengers or property...." 49 C.F.R. § 390.5 (1994). Section 391.1 has since been revised to refer to "commercial motor vehicle" rather than simply "motor vehicle." See 49 C.F.R. § 391.1 (1997).

6. "Motor carrier means a for-hire motor carrier or a private motor carrier .... [and] includes the term[ ] employer...." 49 C.F.R. § 390.5 (1994).

vehicle unless he is physically qualified to do so and, except as provided in § 391.67, has on his person the original, or a photographic copy, of a medical examiner's certificate that he is physically qualified to drive a motor vehicle ." According to the FMCSRs:

(b) A person is physically qualified to drive a motor vehicle if that person—

\* \* \* \* \* \*

(3) Has no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control. . . .

49 C.F.R. § 391.41(b)(3) (1994). Instructions to medical examiners performing physical examinations for purposes of section 391.41 stated that "[i]f insulin is necessary to control a diabetic condition, the driver is not qualified to operate a motor vehicle." 49 C.F.R. § 391.43(e) (1994). Insulin-dependent diabetics were not eligible for any exclusions or waivers of the physical qualifications allowed by the above FMCSRs or DOT.

The consequences of a failure to qualify under the FMCSRs were (and remain) absolute: "A person *shall not* drive a motor vehicle unless he is qualified to drive a motor vehicle . . . . a motor carrier *shall not* require or permit a person to drive a motor vehicle unless that person is qualified. . . ." 49 C.F.R. § 391.11(a) (1994) (emphasis added); *see* 49 C.F.R. § 391.11(a) (1997). The DOT itself has indicated that "[i]n the case of vision, hearing, insulin-using diabetics, and epilepsy, the current standards are absolute, providing no discretion to the medical examiner." Dept. of Transp., *U.S. DOT Interpretations—May 4, 1997* at § 391.41 question 3.

Plaintiff Thoms applied for a driver/dock laborer position with ABF on May 18, 1994. He took a post-offer, pre-employment physical examination and met the requirements of the FMCSRs, thus receiving a DOT medical certificate. On June 13, 1994, Thoms began working at ABF as a casual driver/dock laborer. At some point after he started, the union designated him as a preferred casual employee. Thoms worked for ABF for about four months, through October 14, 1994, averaging about 50 hours of work each week.

On October 15, 1994, Thoms had to be hospitalized. He was diagnosed as an insulin-dependent diabetic and remained in the hospital until October 18. After his discharge Thoms returned to work at ABF's Milwaukee terminal, but the operations manager, Jim Wagner, sent him to a company-retained physician, Dr. Jose V. Montenegro, for examination.

Dr. Montenegro examined Thoms and sent Wagner a letter stating that Thoms was "a newly diagnosed, insulin-dependent diabetic" and "[a]ccording to Federal Motor Carrier Safety Regulations, he is unqualified to drive in interstate commerce." Notwithstanding the FMCSRs, however, Dr. Montenegro issued Thoms a DOT medical certification, but tacked on a restriction of driving to "within 100 air miles of his place of work." After reviewing the medical certificate, Wagner contacted ABF's Director of Personnel, Dan Griesse, and Director of Labor Relations, Don Little, both of whom work at ABF's corporate headquarters in Fort Smith, Arkansas. Griesse and Little directed Wagner to speak with Dr. Montenegro and explain that Thoms operated a commercial motor vehicle in interstate commerce and thus, in their opinion, had to meet the FMCSRs. Wagner did so.

Griesse made the decision to remove Thoms from the preferred casual list because he thought Thoms, as an insulin-dependent diabetic, could not meet the medical requirements that apply to commercial motor vehicle drivers as set forth in the FMCSRs. On October 27, 1994, Wagner informed Thoms that ABF was removing him from the preferred casual list, in effect terminating Thoms's employment with the company.

On November 2, 1994, Dr. Montenegro informed Thoms that he should not have issued the DOT medical certificate.

In November 1994 Thoms filed a grievance with the union and requested to be returned to the preferred casual list and receive backpay for lost time. The grievance was denied at each stage of the grievance procedure set forth in the collective bargaining agreement.

Although during the week and a half following his discharge from the hospital Thoms experienced symptoms related to taking too much insulin, once the insulin level was adjusted Thoms did not experience any symp-

toms, medical conditions or complaints due to his diabetes. Thoms has not been hospitalized because of his diabetes since the onset episode in October 1994. He took insulin to control the diabetes from October 18, 1994, until February 12, 1997, when his physician put him on an oral medication instead. When asked at his deposition in August 1997 whether the diabetes affected his ability to do anything, Thoms responded: "No, not at all. Look at my attendance from Total Delivery [his current employer], not a day missed." Thoms Depo. at 233.

At his deposition Thoms also testified that ABF could have accommodated his medical condition by: (1) eliminating all of his job duties except "hooking" and "unhooking" trailers onto and off of truck tractors; (2) eliminating his driving duties so that he only performed dock laborer functions; and (3) permitting him to be a "city driver", driving only within Milwaukee. Thoms Depo. at 235–36. Generally, obtaining a city driver position required about ten years of seniority.

Thoms filed this lawsuit against ABF on December 13, 1996. On November 24, 1997, ABF filed a motion for summary judgment, asserting several reasons why the motion should be granted in whole or in part. The motion is fully briefed and ready for decision.

## II. SUMMARY JUDGMENT STANDARD

As is well known, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party has the initial burden of demonstrating the absence of a *genuine issue of material fact* and that it is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

When, however, the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing

evidence that would support a reasonable jury verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 267, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. The mere existence of some factual dispute does not defeat a summary judgment motion; the requirement is that there is a *genuine* issue of *material* fact, *Anderson*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), meaning that the factual dispute must be outcome-determinative under governing law, *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir.1997). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine need for trial and summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. But "[s]elf-serving assertions without factual support in the record will not defeat a motion for summary judgment." *Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054, 1058 (7th Cir.1994) (citation omitted).

## III. ANALYSIS

### A. The ADA, the Parties' Arguments, and the Court's Decision in a Nutshell

The ADA, which is the sole basis for Thoms's lawsuit, prohibits an employer's discrimination "against a qualified individual with a disability because of the disability" in regard to "discharge ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[7] Establishing that he is a "qualified individual with a disability" is a required element of Thoms's claim. 42 U.S.C. § 12112(a).

---

7. From this point forward, unless otherwise noted by specific year, the statutes and regulations

cited in this decision do not substantively differ between the 1994 and 1997 versions.

Congress expressly defined a "qualified individual with a disability" as

an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8). For purposes of the ADA and this case "disability" means "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2). Federal regulations define "major life activities" as basic functions of life "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

To establish that he is a "qualified" individual with a disability, Thoms must satisfy a two step test:

First, the individual must satisfy "the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, *licenses, etc.*" ... Second, the individual must be able to "perform the essential functions of the position held or desired, with or without reasonable accommodation."

*Weiler v. Household Fin. Corp.,* 101 F.3d 519, 524 (7th Cir.1996) (emphasis added) (quoting 29 C.F.R. pt. 1630, app. § 1630.2(m)). Whether a plaintiff meets the definition of a qualified individual with a disability is determined as of the time of the employment decision. *Id.*

Federal statutes and regulations provide employers with certain enumerated defenses to a charge of ADA discrimination. Most pertinent to this case is the defense that "a challenged action is required or necessitated by another Federal law or regulation, or that another Federal law or regulation prohibits an action ... that would otherwise be required by this part." 29 C.F.R. § 1630.15(e).

A second defense to a charge of discrimination in violation of the ADA is that an alleged application of "qualification standards" that deny a job to an individual with a disability is job-related and consistent with business necessity. 42 U.S.C. § 12113(a); 29 C.F.R. § 1630.15(b). The term "qualification standards" "may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b); *see also* 29 C.F.R. § 1630.15(b). "Direct threat" means "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3); *see* 29 C.F.R. § 1630.2(r).

ABF argues three points concerning Thoms's status as a "qualified individual with a disability": first, that Thoms's diabetes does not constitute a disability because in its medicated state it does not substantially limit any major life activities; second, that even if his diabetes is considered a disability, Thoms is not a qualified individual for purposes of the driver/dock laborer position because the FMCSRs disqualify him from driving; and third, that ABF falls under the qualifications standards defense because Thoms's condition could pose a direct threat to others if he were allowed to drive. Because I find the second argument dispositive I refrain from addressing the other two, as well as the other reasons ABF proffers in support of its motion but which affect only portions of Thoms's claims or relief. For purposes of this decision I will assume that Thoms's diabetes constitutes a "disability" and that ABF terminated Thoms's employment because of that disability.

As to the dispositive argument, ABF contends that it, its vehicles and its drivers are covered by the FMCSRs quoted above; that the FMCSRs absolutely exclude insulin-dependent diabetics from being physically qualified to drive ABF's motor vehicles; and that driving ABF's motor vehicles is an essential function for the driver/dock laborer position. Therefore, argues ABF, as an insulin-dependent diabetic Thoms is not a "qualified individual with a disability," nor can he be with any reasonable accommodation.

In response, Thoms counters first that he is qualified for the driver/dock laborer position because he drove only intrastate rather than across state lines, which he says means he did not have to meet the FMCSRs' certification requirements. Thoms is medically qualified pursuant to the State of Wisconsin's standards to drive within the state, which, Thoms contends, is all his intrastate position needed. Second, Thoms asserts that ABF could not apply the FMCSRs' exclusion of diabetics to him as a blanket rule, but had to conduct an individualized inquiry into whether he was physically unable to drive ABF's vehicles. And finally, Thoms contends that even if the FMCSRs apply, he remained qualified to satisfy the dock laborer and yard spotter portions of his job, there was plenty of that work to go around, and therefore he was a "qualified individual" if ABF accommodated him by separating the driving duties from the remainder of his job responsibilities.

### B. The FMCSRs Apply to ABF and its Vehicles

As stated above, the FMCSRs apply to "all employers, employees, and commercial motor vehicles, which transport property or passengers in interstate commerce." 49 C.F.R. § 390.3. The FMCSRs' definitions of "interstate commerce" and "intrastate commerce" are controlling:

> *Interstate commerce* means trade, traffic, or transportation in the United States which is between a place in a State and a place outside of such State (including a place outside of the United States) or is between two places in a State through another State or a place outside of the United States.

> *Intrastate commerce* means any trade, traffic, or transportation in any State which is not described in the term "interstate commerce."

49 C.F.R. § 390.5. The fact that Thoms himself drove only within Wisconsin's borders is *not* determinative. The regulations broadly refer to "property [transported] ... in interstate commerce," *not* "drivers who drive interstate." I instead look at ABF's business and the property carried, both of which clearly are a part of the stream of interstate commerce.

■ I find that the FMCSRs do apply to ABF, its driver/dock laborer position, Thoms, and the vehicles he drove. Thoms admitted at his deposition that the inbound freight at the Milwaukee terminal, which was then loaded onto the trucks driven by driver/dock laborers, "came from all over the United States." Thoms Depo. at 108. He conceded that he himself delivered freight that had come to the ABF terminal from out-of-state locations. *Id.* at 181. Thoms does not dispute that the Milwaukee terminal was an outlying spoke of a nation-wide terminal system. He further admitted that when he drove within Wisconsin he drove on interstate highways. *Id.* I consider the freight and Thoms's job to constitute the end-stages of "trade[ and] traffic ... between a place in a State and a place outside of such State" until ABF delivered that freight to its customers, and the beginnings of such interstate trade for property being picked up from customers. Thoms and the vehicles he drove transported property that was part of the interstate commerce stream. See also *Murphy v. United Parcel Service, Inc.*, 946 F.Supp. 872 (D.Kan.1996), *aff'd*, 141 F.3d 1185 (10th Cir.1998) (table), in which the FMCSRs applied to a driver/mechanic of UPS tractor-trailers when packages on board were traveling in interstate commerce.

Thoms therefore had to meet the physical qualifications of and be certified under the FMCSRs in order to drive a tractor-trailer for ABF, and he does not dispute that his diabetes was an automatic disqualification. The fact that the State of Wisconsin would allow Thoms to deliver for another employer goods generated and transported solely within the state's boundaries is immaterial, as the federal requirements trump the state's standards in regard to ABF, its drivers, its vehicles, and its freight.

### C. Driving is an Essential Function of the Job

The next question, then, is whether driving a tractor-trailer is an "essential function" of the driver/dock laborer position. The undisputed evidence shows that it is.

"Essential functions" are the fundamental job duties of the employment position; the term does not include marginal functions. 29 C.F.R. § 1630.2(n). A job function is consid-

ered essential when "the reason the position exists is to perform that function." 29 C.F.R. § 1630.2(n)(2)(i). Evidence of whether a particular function is essential includes, among other things, the employer's judgment on the matter and written job descriptions for the job, 42 U.S.C. § 12111(8), the amount of time spent on the job performing the function, the consequences of not requiring the person to perform the function, the terms of a collective bargaining agreement, and the work experience of others in the job. 29 C.F.R. § 1630.2(n)(3).

One of ABF's proposed findings of fact, to which Thoms made no objection, states that "[t]he driver/dock laborer position is a combination position that requires employees to perform *two essential functions* ": operating as pickup and delivery drivers and operating as dock laborers. ABF's Statement of Material Facts at ¶ 22 (emphasis added). The form job description for the pick-up and delivery driver half of the job, which was effective prior to Thom's hiring and is weighty evidence on the matter, *see* 42 U.S.C. § 12111(8), lists as one of the "essential job functions" of the position that the driver "must be able to operate a tractor trailer." One of the minimum requirements is that "[d]rivers must have the ability to operate a commercial motor vehicle." [8] According to these job descriptions, pick-ups and deliveries, using commercial motor vehicles carrying products in interstate commerce, are the reasons the "driver" portion of the job exists.

All driver/dock laborers split their duties. From day to day and week to week the amount of time spent on each job is indeterminate. Although at his deposition Thoms stated that he himself spent more time as a dock laborer, he also stated that for periods of time he drove more often, once for about two weeks straight. Thoms Depo. at 149–50. As Thoms was a preferred casual worker with no seniority, if regular driver/dock laborers happened to choose dock work on a particular day, ABF would not be able to send Thoms out on the road and would have to call in additional casual employees to take his place. While Thoms contends that regular employees in practice usually chose driving over dock work, that fact is not a material one. Thoms was not merely a dock worker. Driving was an integral component of the two-part driver/dock laborer job, even for Thoms himself.

■ I find that in light of all these factors, driving a motor vehicle to pick up and deliver products in interstate commerce is an essential component of the driver/dock laborer job. Through his inability to obtain medical certification under the FMCSRs, Thoms failed to satisfy one of the job-related license requirements of the position and was automatically disqualified from driving a motor vehicle over 10,000 pounds. He obviously then could not satisfy the job's essential function of being able to drive such a vehicle to make pick-ups and deliveries.

### D. No Individualized Consideration by ABF was Necessary

In supplemental briefing to the court, Thoms argues that the ADA prohibits blanket exclusions and that the blanket licensing exclusion of insulin-dependent diabetics is unfair.

### 1. The ADA Does Not Prohibit This Blanket Exclusion

■ Several cases do state that under the ADA blanket exclusions are generally unacceptable. *See Sarsycki v. United Parcel Serv.*, 862 F.Supp. 336, 341 (W.D.Okla.1994) (individualized assessment "necessary if persons with disabilities are to be protected from unfair and inaccurate stereotypes and prejudices"); *see also School Bd. v. Arline*, 480 U.S. 273, 287, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (Rehabilitation Act case [9] in which Court noted that whether person is otherwise

---

8. In addition to being a DOT requirement, ABF had a company policy, also set forth in this written job description, that all drivers "must possess the ability to obtain a commercial drivers license and to meet D.O.T. medical qualifications and drug testing requirements." ABF's Appendix, Ex. F, Tab 2, p. ABF429. The company's "work site analysis" for the pickup and delivery driver job reiterated that DOT certification was

necessary. ABF's Appendix, Ex. F, Tab 2, p. ABF432. This decision and order sets forth no opinion on whether ABF's policy would survive in the absence of the FMCSRs' application to this case.

9. The Rehabilitation Act, 29 U.S.C. §§ 791 *et seq.*, is materially identical to and the model for the ADA, except that it is limited to programs

qualified should "in most cases" be made by "individualized inquiry"). Thoms's argument, however, ignores the plain text of 29 C.F.R. § 1630.15(e), which provides that compliance with federal regulations is a complete defense for an employer faced with an ADA claim. The EEOC's Technical Assistance Manual elaborates on the deference to other federal requirements with an example right on point:

> The ADA does not override health and safety requirements established under other Federal laws. If a standard is required by another Federal law, an employer must comply with it and does not have to show that the standard is job related and consistent with business necessity.
>
> > For example: An employee who is being hired to drive a vehicle in interstate commerce must meet safety requirements established by the U.S. Department of Transportation....

EEOC Technical Assistance Manual at IV–16 (ABF's Supplemental Memorandum, Ex. A); *see also* H.R.Rep. No. 101–485, pt. 2 at 57 (1990) ("With respect to covered entities subject to rules promulgated by the Department of Transportation regarding physical qualifications for drivers ... it is the Committee's intent that a person with a disability applying for or currently holding a job subject to these standards must be able to satisfy any physical qualification standard that is job related and consistent with business necessity in order to be a qualified individual with a disability...."), *quoted in Murphy*, 946 F.Supp. at 883–84; *Rice v. Genova Products, Inc.*, 978 F.Supp. 813, 822 (N.D.Ind.1997) ("[I]t is well established in the case law, the ADA itself, and the legislative history of the Act that reliance on a federal requirement or regulation constitutes a defense to an ADA claim, absent evidence of pretext.").

All cases Thoms cites in support of his argument that the ADA always requires an individualized inquiry are distinguishable. In none of them was the employer's blanket exclusion mandated by federal law. *See, e.g., Bombrys v. City of Toledo*, 849 F.Supp. 1210 (N.D.Ohio 1993) (city, in absence of federal statute or regulation, excluded all insulin-

dependent diabetics from joining police force; court found blanket exclusion impermissible); *Bentivegna v. United States Dept. of Labor*, 694 F.2d 619 (9th Cir.1982) (city building repairman terminated after glucose tested at level considered too high under city guideline; court found insufficient connection between particular job requirement of controlling blood sugar levels and considerations of business necessity and safety). In *Sarsycki, supra*, in fact, where the plaintiff drove only vehicles weighing less than 10,000 pounds, the court recognized that the inapplicability of the FMCSRs is what required defendant to make an individualized assessment of plaintiff's medical condition:

> Thus, to the extent UPS policy applies to vehicles weighing 10,000 pounds or less, it is not required by federal law, and UPS must establish its policy is justifiable based on safety concerns.... show[ing] that the individual with a disability poses "a direct threat to the health or safety of other individuals in the workplace."

*Sarsycki*, 862 F.Supp. at 341 (quoting 42 U.S.C. § 12113(b)).

In short, the ADA recognizes the primacy of the FMCSRs. Any requirement of an individualized assessment of physical condition and risk of harm to public safety is eliminated by the FMCSRs, which indicate that insulin-dependent diabetics as a matter of law are an unacceptable risk in regard to driving large commercial vehicles. Where a federal agency "has established a certain safety standard ... and there is no way in which an individual with a certain handicap can meet that standard, the law does not require the pointless exercise of allowing him to try." *Buck v. United States Dept. of Transp.*, 56 F.3d 1406, 1408 (D.C.Cir.1995) (DOT regulations provide that drivers must hear with a certain acuity; "[o]nce an individual has admitted that he does not meet such a necessary ... standard, the Rehabilitation Act does not forbid the application to him of a general rule.").

### 2. The Question of Fairness

■ Thoms does not argue that the blanket exclusion of insulin dependent diabetics

---

that receive federal financial assistance. *Crawford v. Indiana Dept. of Corrections*, 115 F.3d

481, 483 (7th Cir.1997).

violates due process, but that is the implication of his assertion that the policy is unfair.[10] It is very difficult not to be sympathetic to this argument. No matter how well Thoms may be able to control his condition, and no matter how minimal a risk his driving may create, under the regulation he is disqualified as a driver. Nevertheless, the law on this issue is against him. A three-judge panel in this district has determined that the exclusion is constitutional. In *Monnier v. United States Department of Transportation*, 465 F.Supp. 718 (E.D.Wis.1979), the diabetic plaintiff challenged the same provision currently at issue, providing statements of several medical doctors who believed that insulin-dependent diabetes mellitus should not be an absolute bar to a DOT license. Monnier argued for an exemption for individuals who could establish that the ailment in no way constituted a hazard for their operation of a motor vehicle. Then–Chief Circuit Judge Fairchild and Judges Gordon and Warren of this district determined that the regulation was not arbitrary and capricious such that Monnier was entitled to an individual hearing regarding his qualifications, and that there was a rational and reasonable basis for the regulation.

Even if the FMCSRs' blanket exclusion of diabetics deserved a fresh look in light of medical advances over the past twenty years regarding the control of diabetes, the DOT has done that. The diabetes exclusion was originally promulgated in the early 1970s and was thoroughly reviewed by the Federal Highway Administrator during the course of the *Monnier* case. *Monnier*, 465 F.Supp. at 722. The DOT reexamined its regulations again after passage of the ADA. While the DOT's recent reexamination of its blanket exclusions resulted in revised standards or waivers upon individualized review in regard to certain disabilities, *see, e.g., Kirkingburg v. Albertson's, Inc.*, 143 F.3d 1228, 1234 (9th Cir.1998) (waiver program for monocular-vi-

sion truck drivers was the result of review by DOT in light of ADA's mandates), the DOT in the end rejected a proposal to lift the absolute prohibition of insulin-dependent diabetics, citing the nature, likelihood, and severity of potential harm to public safety. *See* 58 Fed.Reg. at 40,693–94 (ABF's Statement of Material Facts, Ex. L); 49 C.F.R. § 391.41(b)(3) (1997). In view of this precedent, and in the absence of a compelling argument that blanket exclusion is unconstitutional, I am not inclined to invalidate the DOT regulation even assuming I have the power to do so.

### E. No Reasonable Accommodation Exists

Last is the matter of accommodation. Thoms may nevertheless meet the definition of a "qualified individual with a disability" if he can show that a reasonable accommodation would allow him to perform the essential functions of the "employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

There is no way around the FMCSRs through accommodation, however. Again, the ADA bows to the FMCSR certification requirements. No accommodation short of obtaining a waiver from the federal government, which cannot be done, can make an insulin-dependent diabetic qualified to drive a commercial motor vehicle in interstate commerce. *Baert v. Euclid Beverage, Ltd.*, 954 F.Supp. 170, 173 (N.D.Ill.1997). Neither ABF nor this court can grant Thoms some waiver. Thoms, recognizing that fact, effectively concedes in his original brief that if the FMCSRs apply to him, he cannot, through some accommodation or waiver, get to drive ABF's trucks.

Thoms instead argues that although it is undisputed that ABF does not maintain a purely dock laborer position at the Milwaukee terminal nor a yard spotter or hostler position, ABF's Statement of Material Facts at ¶ 19, *it could have*, Thoms's Response to Proposed Findings of Fact at ¶ 5.[11] Accord-

10. The Hobbs Act, 28 U.S.C. §§ 2321–2323, provides that a direct challenge to the constitutionality of the regulations of the Surface Transportation Board should be brought in the court of appeals in a case naming the United States as defendant. *Id.; Carpenter v. Department of Transp.*, 13 F.3d 313 (9th Cir.1994).

11. In his response to ABF's proposed findings of fact, Thoms states that ABF did in fact have a yard spotter or hostler position, regardless of the official title given to the position. Evidentiary support for this statement does not exist, however. The evidence cited indicates only that sufficient dock work was available such that ABF

ing to Thoms there was plenty of work to be done around the Milwaukee terminal loading and unloading freight and hooking and unhooking trailers.[12]

Reasonable accommodations generally involve "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a *qualified individual* with a disability *to perform the essential functions of that position,*" 29 C.F.R. § 1630.2(o)(1)(ii) (emphasis added), rather than rearrangements of the essential functions themselves. The ADA, through its statement that reasonable accommodations may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, ... and other similar accommodations for individuals with disabilities," 42 U.S.C. § 12111(9)(B), can require an employer to reassign a disabled employee to a different position as a reasonable accommodation even when the employee can no longer perform the essential functions of his or her current position. *Gile v. United Airlines, Inc.,* 95 F.3d 492, 498 (7th Cir.1996). But accommodations that consist of shifting essential duties to coworkers have been held unreasonable as a matter of law. *Stubbs v. Marc Ctr.,* 950 F.Supp. 889, 895 (C.D.Ill.1997). An employer is *not* obligated to reallocate essential job functions themselves; a qualified individual *must* perform essential functions of the job. *Cochrum v. Old Ben Coal Co.,* 102 F.3d 908, 913 (7th Cir.1996); *see Murphy,* 946 F.Supp. at 883 (UPS did not have to assign mechanic's road test and vehicle pick-up driving duties to other employees). Neither must an employer create a "new" position for the disabled employee. *Gile,* 95 F.3d at 499; *Fedro v. Reno,* 21 F.3d 1391, 1396 (7th Cir.1994).

Thoms does not argue that reassigning him to a clerical position at the Milwau-

kee terminal or to a job at another terminal for which he qualified was desirable or even an option. Further, Thoms admits that no other nonmanagement positions existed at the Milwaukee terminal. He argues instead that ABF could have broken the driver/dock laborer position down and allowed him to do just dock laborer and yard spotter work. He contends that whether this was possible is a disputed question of material fact that gets him to trial. I find, however, that no *material* fact issue exists and that as a matter of law what Thoms wants is for ABF to reallocate an essential job function and create a new position at the Milwaukee terminal—a position solely for him. Seventh Circuit law is clear that such action is not required by the ADA. In *Fedro,* in fact, the disabled plaintiff sued under the Rehabilitation Act in an attempt to force the U.S. Marshals service to combine two part-time positions for him, as no full-time position was available to which he could transfer and meet the essential job functions. The Seventh Circuit stated that while the Rehabilitation Act requires reassignment to a vacant position when the current or previous job is unavailable because of disability, the Act "does not require reassignment to a position that does not exist." *Fedro,* 21 F.3d at 1395 n. 5. A similar situation exists here, but in reverse—Thoms wants to break down a two-part position into a one-function job—and the same reasoning applies. The ADA does not require Thoms to be reassigned to a position that does not exist at the Milwaukee terminal. Reallocation of essential functions of the driver/dock laborer job and creation of a new position at the Milwaukee terminal therefore are not reasonable accommodations.[13]

The facts of this case do suggest that creation of such a position might not impose that great a hardship on ABF—for example,

could have created such a position. Thoms Affidavit at ¶ 6; Thoms Depo. at 236–37.

12. Although at his deposition Thoms told ABF that he could have been accommodated by doing "city driving" alone, he has dropped that argument before this court. It would not be possible under the FMCSRs in any event, as the products transported would still be considered a part of interstate commerce.

13. ABF also asserts that creation of a new position or eliminating Thoms's driving duties would have conflicted with the seniority rights of the regular driver/dock laborers at the Milwaukee terminal and thus would have interfered with the terms of its collective bargaining agreement with the union; Thoms disputes whether that is true. Based on my belief that the ADA does not require the creation of a new position I find no need to construe the collective bargaining agreement to decide whether its terms bar such action.

ABF already has two separate written job descriptions concerning the two parts of the driver/dock laborer position. *See* ABF's Appendix, Ex. F, Tab 2. And it might be true, as Thoms contends, that the driving portion of the job was actually more desired by regular employees so there was plenty of dock work to go around and the collective bargaining agreement allowed such an allocation of work. But whether a break-out of the dock laborer job was feasible and good business sense cannot enter into my decision. The ADA does not mandate such action by ABF and it is not my place to dictate ABF's internal business policies and structure. The law does not require affirmative action in favor of individuals with disabilities. It merely prohibits employment discrimination against qualified individuals with disabilities, nothing more and nothing less. *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir.1996).

### F. Persuasive Authority Supports the Decision in ABF's Favor

My conclusion that Thoms is not a qualified individual with a disability falls in line with several others brought by individuals precluded by the FMCSRs from driving commercial trucks or buses. *Baert, supra,* is the closest factually and analytically. Baert drove a beer delivery truck until he was diagnosed with insulin-dependent diabetes. The FMCSRs thereafter precluded him from driving and he sought relief under the ADA when his employer terminated him. Judge Leinenweber in the Northern District of Illinois found that because Baert did not have the fundamental prerequisite of a commercial driver's license to drive the employer's trucks he was not a qualified individual with a disability. Further, there was no reasonable accommodation the employer could have made. *Baert,* 954 F.Supp. at 173–74.

In *Murphy, supra,* plaintiff Murphy had high blood pressure. His mechanic job required that he drive UPS tractor-trailers for road tests and repair calls. The FMCSRs provide that a person is not physically qualified to drive a commercial motor vehicle if he has a current clinical diagnosis of high blood pressure. 49 C.F.R. § 391.41(b)(6). DOT medical regulatory criteria describe high blood pressure as a reading of more than 160/90. Murphy could not take the amount of medication necessary to get his blood pressure that low without severe consequences. But by not meeting the DOT criteria, Murphy could not obtain the DOT certification necessary to drive. The district court found that because he could not get DOT certification Murphy was not a qualified individual with a disability and that UPS had a complete defense in its compliance with the DOT regulations. *Murphy,* 946 F.Supp. at 882–84.

Although other factually-similar cases were decided on slightly different grounds, the plaintiffs' claims of disability discrimination nevertheless failed. *See Daugherty v. City of El Paso,* 56 F.3d 695, 697–98 (5th Cir.1995) (holding as a matter of law that former public bus driver diagnosed with insulin-dependent diabetes presented a genuine substantial risk that he could injure others, meaning under ADA he was not a "qualified individual with a disability" for the position of bus driver); *Chandler v. City of Dallas,* 2 F.3d 1385, 1395 (5th Cir.1993) (holding as a matter of law that a driver with insulin-dependent diabetes as discussed in 49 C.F.R. § 391.41 presented a genuine substantial risk that he could injure others, meaning he was not "otherwise qualified" under the Rehabilitation Act); *Christopher v. Laidlaw Transit Inc.,* 899 F.Supp. 1224 (S.D.N.Y.1995) (plaintiff did not dispute that under FMCSRs he was not qualified to drive a school bus; court found no sufficiently alleged reasonable accommodations).

Thoms's circumstances were unfortunate. He suffered a serious medical problem that caused him to lose a good job. But federal case law is clear that a fired worker who cannot do the job even with a reasonable accommodation has no claim under the ADA. *Matthews v. Commonwealth Edison Co.,* 128 F.3d 1194, 1195 (7th Cir.1997). "It is irrelevant that the lack of qualification is due entirely to a disability." *Id.* As Judge Posner put it in *Matthews,* in general a blind person cannot complain because a prison refuses to hire him as a guard, an alcoholic cannot complain about a trucking company's refusal to hire him as a driver because as a consequence of his alcoholism his driving license has been revoked, and if an insulin-

dependent diabetic cannot be depended upon to drive a bus safely, he cannot complain about being disqualified from working as a bus driver, even if he is fully qualified but for his being a diabetic. *Id.* (citations omitted).

## IV. CONCLUSION

In sum, there is no genuine factual dispute about Thoms's inability to obtain DOT certification, and without that certification he lacks an essential qualification for an essential part of the driver/dock laborer position. The ADA does not require ABF to create a new employment position to accommodate him, and as a result, Thoms is not a "qualified individual with a disability" protected by the ADA.

**THEREFORE, IT IS ORDERED** that ABF's motion for summary judgment is **GRANTED** and this case is **DISMISSED** in its entirety. The clerk shall enter judgment accordingly.